## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RAY HAAS, as Personal
Representative of the Estate
of Richard Tiner, deceased.

      Plaintiff,

v.                                                          Case No: 8:23-cv-2753-CEH-SPF

METROPOLITAN GENERAL
INSURANCE COMPANY,

      Defendant.
_____/

## O R D E R

Before the Court in this bad faith insurance dispute is Defendant, Metropolitan General Insurance Company's Motion for Summary Judgment (Doc. 20).  Defendant requests judgment in its favor on Plaintiff's claim that it breached its fiduciary duty of good faith to its insureds, William and Nancy Harris. Plaintiff filed a response in opposition (Doc. 25), and Defendant replied (Doc. 28). Additionally, the parties filed a Joint Stipulation of Agreed Material Facts. Doc. 24. The Court having carefully considered the motion, response, reply, the parties' stipulated facts, the exhibits, affidavits, discovery, and depositions filed in support of the parties' respective positions, and being fully advised in the premises, will deny Defendant's Motion for Summary Judgment because genuine disputes as to material facts exist precluding summary judgment.

## I.    FACTUAL BACKGROUND[1]

### A.    Stipulated Facts (Doc. 24)

The parties agree on the following facts: On December 20, 2016, Richard Tiner ("Tiner") was involved in a motor vehicle accident with Defendant's insured Nancy Harris ("Harris"), who was driving a 2008 Town and Country automobile owned by her husband, William Harris. Doc. 24 ¶ 2. Tiner was driving a motorcycle, which he owned, and was traveling southbound in the inside line of Old U.S. 41 approaching the intersection of Brooks Road. *Id.* Harris attempted to make a left turn onto northbound Old U.S. 41 when she struck Tiner ejecting him from his motorcycle. *Id.*

The Harrises are the named insureds on a policy of insurance issued by Defendant Metropolitan General Insurance Company ("MET"), which provided bodily injury liability limits of $10,000 per person/$20,000 per accident and was in effect at the time of the accident. *Id.* ¶ 3. On December 20, 2016, Harris reported the accident to MET. *Id.* ¶ 4. On that same date, MET assigned a claim number to the matter. *Id.* On December 21, 2016, the claim was assigned to MET adjuster, Kim Stephens ("Stephens"). *Id.*    ¶ 5. On December 22, 2016, Stephens began her investigation of the claim locating a news article which provided names and details regarding the accident. *Id.* ¶ 6. She noted that Tiner was ejected from his motorcycle and was transported to Lee Memorial Hospital in critical condition. *Id.* Additional

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including the parties' Stipulation of Agreed Material Facts (Doc. 24). For purposes of summary judgment, the Court presents the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

investigation by Stephens revealed photographs of the incident which showed heavy impact to both the insured's vehicle and the motorcycle. *Id.* ¶ 7.

On December 22, 2016, Stephens called Harris and learned that William Harris, Nancy's husband, was the sole owner of the vehicle she was driving in the accident. *Id.* ¶ 8. Stephens advised Harris that there was some negligence on her behalf based on the information known to date. *Id.* She further advised Harris of the $10,000 per person limit available under the policy and told her that Tiner's injuries and bills will far exceed her insurance coverage limit. *Id.* Stephens indicated that she intended to call the hospital to obtain more information regarding Tiner's injuries. *Id.* On December 22, 2016, Stephens sent a letter to Mr. and Mrs. Harris advising that Tiner's bodily injury claim may exceed their policy limits. *Id.* ¶ 9; Doc. 20-5. Thereafter, Stephens called the hospital to confirm that Tiner was currently in the ICU. Doc. 24 ¶ 10. Stephens spoke with case manager "Deb" at the hospital who provided directions, names, and phone numbers for how to be cleared to communicate with Tiner. *Id.*

On December 22, 2016, Stephens referred the investigation to independent adjuster, Kelley Alliance, to obtain scene photographs, canvas for witnesses and any video, obtain the police report, and to contact Tiner and/or his family to obtain information about his injuries. *Id.* ¶ 11. Additionally, Stephens advised MET's large loss administrator, through a Home Office Casualty Administrator (HOCA) Alert, of the liability and damage information learned through the initial investigation. *Id.* ¶ 12. MET's HOCA administrator Sheila Donovan ("Donovan") replied immediately indicating that MET "should go ahead and issue a check payable to the claimant and

Lee Memorial Hospital and send it to Mr. Tiner's last known address." *Id.* She further indicated that if Tiner is married, his wife's name will need to be included on the check. *Id.* Donovan advised Stephens to continue with the investigation, send an excess letter to the insureds, and get affidavits from the insureds attesting that there is no other insurance available for the accident and that Harris was not in the course and scope of employment at the time of the accident. *Id.* Stephens completed the tasks. *Id.*

On December 22, 2016, Stephen's immediate supervisor, Angela Busse ("Busse") noted that HOCA has instructed them to send a check for MET's policy limits to the last known address in the name of the claimant and Lee Memorial, once they learn if the claimant is married. *Id.* ¶ 13. Busse instructed the investigator to visit the hospital to determine whether or not Tiner is married, and noted that once this information is confirmed, MET will immediately tender the policy limits. *Id.* On December 27, 2016, Stephens called Harris and advised her that MET would provide her with a copy of the report once it is received. *Id.* ¶ 14. Stephens told Harris that MET "was trying to contact claimant but as of last Thursday he was in the ICU." *Id.* Stephens informed Harris that MET will be "tendering the $10K BI limit." *Id.* She also told Harris that she was sending her an affidavit to verify that she was not in the course and scope of employment and that there was no excess coverage. *Id.*

On December 28, 2016, Stephens documented the claim notes regarding the email received from the investigator indicating that direct contact with Tiner was impossible because he was in the ICU and only friends or family with a pin number had direct contact. *Id.* ¶ 15.  The investigator spoke to Connie Crawford, in patient

business services for the hospital, who confirmed that Tiner was not married. *Id.* Based on this information, MET issued a check for the $10,000 bodily injury policy limits made payable to "Richard Tiner and Lee Memorial Hospital" and mailed it to his home address listed in ISO and whitepages.com. *Id.*  MET sent the $10,000 check and a proposed release to Tiner with a letter dated December 28, 2016, to his home address. *Id.* ¶ 16; Doc. 20-6. On December 30, 2016, Stephens conducted an online search, locating a Lee Memorial Hospital lien dated December 28 that totaled $284,208.90. Doc. 24 ¶ 17.

On January 3, 2017, Stephens documented the claim notes regarding an email received from the investigator who took photographs of the accident scene. *Id.* ¶ 18. The following day, Donovan directed Stephens to follow up with the investigator and have them visit the claimant's last known address to see if any family members are there. *Id.* ¶ 19. They were also to go to the hospital where there was generally an "ICU waiting room." *Id.* Donovan further directed Stephens to keep the insured informed and to follow up with the insureds regarding the affidavit of no other insurance and not in course and scope of employment. *Id.*

On January 5, 2017, Stephens instructed the investigator to go to the claimant's address and the ICU waiting room to attempt to "locate a family member for Mr. Tiner" as contact has not been made. *Id.* ¶ 20. On January 9, 2017, MET's investigator reported that on January 7 "nobody appeared to be within the residence." *Id.* ¶ 21. However, the investigator left contact information with Tiner's nurse at the hospital.

*Id.* This prompted Tiner to speak with MET on January 9, saying "he has an atty and the [attorney] would be contacting me." *Id.* Stephens noted that she will monitor for claimant attorney info. *Id.*

The same day, Stephens emailed a copy of the policy report to Harris and requested a status as to when she could expect to receive the affidavit of scope of employment and no excess coverage for this loss. *Id.* ¶ 22. Stephens advised Harris that Tiner is now represented by an attorney, and she was waiting for attorney contact to discuss resolving this claim. *Id.* Harris then followed up, calling to confirm that she had received Stephens' email regarding the affidavit and that she had already sent it back to MET. *Id.* Harris inquired if Stephens had obtained the claimant's attorney's number to which Stephens responded, "I have no atty info at this point as clmnt did not notify the independent adjuster." *Id.* On January 10, 2017, Donovan noted that MET tendered the policy limits on December 28th and that they now have information that Tiner is represented by counsel. *Id.* ¶ 23. Donovan also notes that "no one will give us the atty info" and that Stephens will document for prompt follow up. *Id.*

On January 11, 2017, Stephens documented that she received the affidavit, but Mr. Harris did not sign it nor was it notarized. *Id.* ¶ 24. Stephens called the insureds and left a message regarding the error and advised that she was sending another affidavit. *Id.* Plaintiff alleges that on January 12, 2017, a letter of representation was faxed by the Czaia law firm to MET at the fax number listed in Kim Stephens' email signature. *Id.* ¶ 25; Doc. 20-7. The letter requested disclosure of insurance information

and an affidavit from the Harrises about no other coverage and not in the course and scope of employment. Doc. 24 ¶ 25. The top of the letter indicates it was sent by facsimile and Certified Mail Return Receipt Requested. *Id.* Plaintiff has been unable to produce a certified mail return receipt or evidence of facsimile transmittal of the January 12th letter. *Id.* ¶ 26.

On January 12, 2017, Stephens documented the claim notes that she was "waiting for a letter of representation." *Id.* ¶ 27. On January 18, 2017, Stephens documented the claim notes indicating that the investigator secured a recorded statement from a witness to the accident who placed at least some fault on the insured and indicated that the claimant's face was 'smashed' and that he was "not responsive." *Id.* ¶ 28.

On February 2, 2017, MET's unit manager, Steven Auberry made an entry in the claim notes indicating that he does not see a letter of representation from Tiner's counsel or an affidavit from the insureds. *Id.* ¶ 29. He instructed Stephens to follow up with the insureds regarding the affidavit and to also inquire if they have received a letter of representation. *Id.* Stephens completed the tasks as instructed and confirmed that the insureds received no letter. *Id.* On the same day, Stephens documented her telephone call to Harris who indicated that she had not received a letter of representation. *Id.* ¶ 30. Stephens noted that she was sending the affidavit and that MET will need Harris and her husband to sign the affidavit in the presence of a notary and return. *Id.* On February 2, 2017, the Harrises executed the affidavit indicating that there was no additional insurance which could provide coverage for the accident, and

that Mrs. Harris was not in the course and scope of any employment at the time of the accident. *Id.* ¶ 31; Doc. 20-9. MET received the Harris affidavit at their St. Louis mailing address on February 6, 2017. Doc. 24 ¶ 31. Stephens confirmed the receipt of the affidavit on February 9, 2017. *Id.* ¶ 32.

On February 14, 2017, Donovan directed Stephens to send a letter to Tiner letting him know that MET has not yet heard from his attorney. *Id.* ¶ 33. The letter also requested to have him confirm that he has retained an attorney and that he still has the check. *Id.* On February 16, 2017, Stephens noted that she is mailing Tiner a letter advising that she has not received any correspondence from an attorney representing him. *Id.* ¶ 34; Doc. 20-10. MET alleges that the letter was sent that day. Doc. 24 ¶ 34.

On March 8, 2017, Stephens documented the claim notes that she sent the letter to Tiner three weeks earlier requesting attorney contact or direct contact. *Id.* ¶ 35. She also noted that the check was still outstanding and to continue to monitor. *Id.* On March 9, 2017, Stephens documented the claim notes indicating that a Disclosure of Insurance Information is in the file for manager review. *Id.* ¶ 36; Doc. 20-12. On the same day, Stephens noted that she had received a voicemail message from Rosana, who works for the attorney retained by Tiner. Doc. 24 ¶ 37. Stephens called her back, and Rosana asked if MET had handled the property damage claim for Tiner's motorcycle. *Id.* Stephens asked Rosana if the law firm had sent a letter of representation, and Rosana advised that the law firm had faxed it on January 12, 2017.

*Id.* Stephens noted that the fax number was not MET's main fax number, but Rosana advised that she had received a confirmation. *Id.* Stephens gave Rosana the main fax number and her email, and Rosana agreed to send a letter of representation along with an affidavit they are requesting from the insureds. *Id.* Rosana informed Stephens that they have the check that was sent to Tiner. *Id.*

On March 9, 2017, Czaia law firm faxed a copy of the letter dated January 12, 2017 to MET. *Id.* ¶ 38. The facsimile transmittal report confirms delivery on March 9, 2017, at 2:14 pm. *Id.* The facsimile transmittal report produced by the Plaintiff included handwritten notes which include MET's main facsimile number, Stephens' email address and handwritten note which states "Re-faxed- cannot locate original." *Id.*; Doc. 20-11. On March 10, 2017, Stephens documented the claim notes regarding receipt of the letter of representation from Tiner's attorney. Doc. 24 ¶ 39. Stephens noted that the letter was dated January 12, 2017 and that it was faxed to 866-947-0184 and sent to the St. Louis P.O. Box. *Id.* However, she further noted that "we" are just receiving the letter. *Id.* Stephens documented that the policy had been ordered and that the disclosure has been prepared and sent to the supervisor for approval. *Id.* Stephens notes that the letter indicates that MET can deal directly with Tiner on the property damage claim, however, Rosana indicated that they want Stephens to deal only with the law office. *Id.* Stephens further notes that MET already has the one-page affidavit and that it would be faxed to the attorney that day. *Id.*

On March 10, 2017, Stephens made an entry in the claim notes documenting the delivery of a 2-page facsimile (including cover sheet) to 813-898-2870. *Id.* ¶ 40. The note confirms that the facsimile was sent and that there were zero errors or cancellations. *Id.* MET has no transmittal of this facsimile to verify its contents. *Id.* On the same day, Sue Knightley from Administrative Support documented the claim notes confirming that the Disclosure of Insurance Information dated March 9, 2017, was mailed to the Czaia Law Group. *Id.* ¶ 41. On March 28, 2017, Stephens called Rosana at the Czaia Law Group to obtain the location of Tiner's motorcycle for inspection. *Id.* ¶ 42. Stephens left a message requesting a return phone call. *Id.* On April 7, 2017, Stephens again documented a call to Rosana at the Czaia Law Group regarding the location of Tiner's motorcycle for inspection. *Id.* ¶ 43. Stephens left a message requesting a return phone call. *Id.* On April 18, 2017, Stephens again attempted to call Rosana at the Czaia Law Group to confirm whether the law firm was handling the PD claim or if Stephens can contact Tiner directly to address the claim; she left a message. *Id.* ¶ 44. On the same date, Stephens sent a follow-up letter to the Czaia Law Group memorializing the message she left for Rosana that day. *Id.*; Doc. 20-13.

Plaintiff alleges that on April 24, 2017, a letter was sent by the Czaia law firm to MET explaining, "Failure to meet the requirement of this demand may result in litigation and the loss of any opportunity your insured may have had to resolve these matters within the limits of insurance coverage offered by your company." Doc. 24 ¶ 45; Doc. 20-14. The letter discusses the injuries that Tiner allegedly sustained as a

10

result of the accident which the law firm alleges was caused by the insured who received a citation for failure to yield to oncoming traffic. Doc. 24 ¶ 45. The letter also indicated that the law firm has evaluated Tiner's damages to exceed the disclosed policy limits but that Tiner "may be willing to accept tender" of the previously disclosed $10,000 policy limits and any excess coverages that apply within 30 days of receipt of: 1) financial affidavits from each responsible party; 2) an affidavit from the insured driver verifying they were not in the course and scope of employment; 3) affidavits from each responsible party indicating that there is no other applicable coverage; 4) a "simple general release"; 5) settlement funds made payable to the Czaia Law firm Trust Account and 6) confirmation that MET will trust the Czaia law firm to resolve all valid liens. *Id.*; *see* Doc. 20-14 at 2. There is no log entry in MET's claim notes of it having received the April 24, 2017 letter from Tiner's attorney. Doc. 24 ¶ 46. Plaintiff has been unable to produce evidence that proves the April 24, 2017 letter was received by MET on or about April 24, 2017. *Id.* ¶ 47. Plaintiff has not produced the return receipt for the letter sent via Priority Mail Express. *Id.* ¶ 48.

On April 24, 2017, Stephens had a telephone call with Maria at the Czaia Law Group. *Id.* ¶ 49. Maria authorized Stephens to contact Tiner directly regarding the property damage claim. *Id.* She provided Tiner's cell phone and motorcycle location. *Id.* Stephens' claim note on April 24, 2017, makes no mention of any discussion with Maria regarding the offer letter from Czaia Law Group that was purportedly sent to MET that same day. *Id.* ¶ 50. On June 1, 2017, Stephens noted Tiner's property damage claim was settled. *Id.* ¶ 51.

11

On June 28, 2017, MET's tax unit alerted Stephens that it was preparing a six-month reminder letter for the $10,000 check issued to Richard Tiner and Lee Memorial that had never been cashed. *Id.* ¶ 52. Stephens called the Czaia law firm advising that the settlement check issued in December 2016 was set to expire. *Id.* She explained that MET will need to reissue the check and would like instructions on how the firm would like the check to be reissued. *Id.* Stephens notes that her message would be given to the attorney. *Id.* The following day, MET's tax unit sent a letter to the Czaia Law Group advising the firm that the settlement check issued for $10,000 was set to expire. *Id.* ¶ 53. On August 7, 2017, Stephens called the Czaia Law Firm to find out how to reissue the stale settlement check. *Id.* ¶ 54. She was unable to reach anyone and left a voicemail requesting a return call. *Id.* On August 16, 2017, Stephens called the Czaia Law Firm again regarding Tiner's stale settlement check and left another message. *Id.* ¶ 55. She notes that she will monitor for a response, and if there is none, she will have the check reissued to the attorney's trust account. *Id.*

On September 9, 2017, Stephens spoke with the Czaia Law Firm and was advised that HD Law Partners was now their co-counsel and she should contact their office. *Id.* ¶ 56. Stephens then called the HD law firm and spoke with Mandy, advising her that the settlement check had expired and that she needed instructions on how to reissue the check. *Id.* Stephens noted that Mandy advised her that the attorney was out but that she will discuss with her and call Stephens back. *Id.*

12

On October 2, 2017, Stephens received a letter of representation from Ray Haas of the HD Law Partners law firm. *Id.* ¶ 57. Stephens called the firm and was told that Czaia had referred the claim to his office to verify that MET had followed through with their request. *Id.* Attorney Haas advised that he would review if the tender of bodily injury limits would be accepted. *Id.* Stephens noted that Haas was requesting copies of all correspondence between MET, Tiner, and former counsel. *Id.* Stephens advised Haas that MET issued a check for the policy limits prior to Tiner's representation and that the Czaia Law Firm has the now expired check. *Id.* Stephens requested information regarding how to reissue the check. *Id.* Haas advised her to not reissue the check at this time to allow him to determine if they accept the tender. *Id.* If the tender is accepted, he will advise her on how to reissue the check. *Id.* Stephens sent a letter to Haas to follow up on their phone conversation. *Id.* ¶ 58; Doc. 20-15.

On October 20, 2017, Haas filed a lawsuit on behalf of Richard Tiner against William and Nancy Harris in Lee County Circuit Court. Doc. 24 ¶ 59; Doc. 20-2. On August 23, 2019, the case went to non-binding arbitration. Doc. 24 ¶ 60. Tiner was awarded $750,000 by the arbitrators on September 10, 2019. *Id.*; *see also* Doc. 20-16. Both the insureds and MET accepted this award. Doc. 24 ¶ 61. On October 18, 2019, a Final Judgement was entered in favor of Tiner in the amount of $750,000.00, excluding attorney fees and costs. *Id.* ¶ 62; Doc. 20-3. On July 23, 2020, a Second Amended Final Judgement was entered in favor of Tiner in the amount of $855,365.93, accounting for attorney fees and costs awarded to Tiner pursuant to a

proposal for settlement. Doc. 24 ¶ 63; Doc. 20-17. MET paid Tiner $105,365.93, plus the $10,000 policy limits, leaving a judgement of $740,000, plus post-judgement interest from October 18, 2019 against Nancy and William Harris. Doc. 24 ¶ 64; Doc. 20-18.

On December 1, 2023, Ray Haas, as Personal Representative of the Estate of Richad Tiner,[2] filed this bad faith lawsuit against MET alleging breach of fiduciary duty of good faith. *Id.* ¶ 65; Doc. 1.

**B.    Other Evidence**

**1.    *Affidavit of Peter Knowe (Doc. 25-5)***

In support of his opposition to the summary judgment motion, Plaintiff submits the affidavit of Peter Knowe, who has been disclosed as an expert in claims handling. Doc. 25-5. Knowe opines that it is an industry custom and practice for an insurer to provide affidavits from its insureds showing they have no additional insurance; such disclosures are standard in cases settling for policy limits where the claim is in excess of those limits. *Id.* ¶ 2. Knowe additionally opines that MET failed to meet insurance industry standards for good faith claims handling when it failed to advise Tiner that a settlement offer had been sent to his home when he was in the hospital and when MET did not follow up with Tiner's counsel with a sense of urgency in an effort to resolve the bodily injury claim. *Id.* ¶¶ 3, 4.

**2.    *Affidavit of Rosana Colon (Doc. 25-6)***

---

[2] Richard Tiner is now deceased. The claim is brought by the administrator of his Estate.

14

Rosana Colon is a legal assistant with the Czaia Law Firm. In 2017, she was responsible for sending and receiving correspondence with insurance companies. Rosana attests that to the best of her recollection, in 2017 she would have followed the firm's standard procedures for mailing correspondence, including the January 12, 2017, letter to MET requesting an affidavit of no other insurance from MET's insured's related to Tiner's claim. Doc. 25-6 ¶¶ 4, 6. To the best of her recollection, she mailed another letter to MET on April 24, 2017, with a 30-day time limit demand about settling the Tiner claim and again requesting affidavits from MET's insureds that there was no other insurance. *Id.* ¶ 7. She states that Tiner authorized the Czaia Law Firm to settle his claim for $10,000 if the firm confirmed that the Harrises had no other available insurance. *Id.* ¶ 5. When the Czaia Law Firm received no response from MET to its April 24, 2017 letter, they referred Tiner to attorney Ray Haas on June 21, 2017. *Id.* ¶ 7.

      3.    *Affidavit of Raymond Haas (Doc. 25-7)*

The Czaia Law Firm referred the Tiner case to Haas on June 21, 2017, to pursue claims against the Harrises. Doc. 25-7 ¶ 3. After reviewing the Czaia Law Firm file materials, Haas confirmed that Czaia never received the affidavit from the Harrises regarding the existence of additional coverage. *Id.* On October 20, 2017, MET provided Haas the affidavit that was signed by the Harrises on February 2, 2017, indicating they had no other insurance and that Nancy Harris was not in the course and scope of her employment at the time of the accident. *Id.* ¶ 4. Had the Harris

affidavit been previously provided to Tiner and the Czaia Law Firm, Haas would have advised Tiner to accept the $10,000 policy limit offer. *Id.*

### 4.    *Deposition of Kimberly Stephens (Doc. 25-4)*

Kimberly Stephens worked for MET as a senior claims adjuster from August 2014 until March 2018. Doc. 25-4 at 9. She was assigned to handle both the bodily injury and property damage claims for the Tiner claim. *Id.* at 10. Some time in 2016, Stephens transitioned to working remotely from her home in Lakeland. *Id.* at 12. This would have been prior to the Tampa office closing. *Id.* During that time frame, mail and faxes would be electronically scanned and filed with the particular claim file to which it was related and then adjusters would receive notification that it was uploaded to the claim file. *Id.* at 13.

As of December 22, 2016, Stephens determined liability was adverse to the Harrises and that the Tiner claim likely exceeded the bodily injury limits of $10,000. *Id.* at 21. The Harrises signed the affidavit of no insurance on February 2, 2017, and it was received by MET's St. Louis office on February 6, 2017. *Id.* at 22. On March 9, 2017, Auberry signed the letter disclosing insurance coverage to the Czaia Law Group. *Id.* The letter referenced enclosures of the coverage disclosures and declarations page, but it did not reference the Harris affidavit. *Id.* A March 10, 2017 claim file note reflects that Tiner's counsel was requesting an affidavit to show no excess coverage available and that Harris was not in the course and scope of employment. *Id.* at 23. The claim note at 9:08 a.m. states that Stephens was faxing to attorney this date, but there is no

copy of a letter in the claim file showing that Tiner's counsel was sent the Harris affidavit. *Id.* at 23-24. There is a confirmation of a fax being sent to the Czaia Law Firm on March 10, 2017 at 9:14 a.m. which was uploaded to the claim file, which Stephens testified would have been the affidavit. *Id.* at 25.

The claim file included notes regarding messages Stephens left for the Czaia law firm on March 28, April 7, and April 18, regarding Tiner's motorcycle and the property damage claim. *Id.* at 33–34. None of the messages referenced resolving the bodily injury claim. *Id.* On May 17 and June 1, 2017, Stephens wrote letters to Tiner about resolving the property damage claim. At no point from March 9 until June 28 did Stephens make contact with the Czaia Law Firm for the purpose of discussing the bodily injury claim of Tiner. *Id.* at 38. She contacted the Czaia Law Firm on June 28 because the MET tax unit had advised her that the check issued to Tiner was going to expire. *Id.*

She called and left messages for the law firm on August 7, August 16, and September 7 regarding the bodily injury claim and advising the check needed to be reissued because it was expiring. *Id.* at 38-39. On September 7, Stephens learned from Czaia Law Firm that they had co-counsel, HD Law Partners. *Id.* at 39. Stephens wrote to HD Law Partners on October 2, 2017, about the Tiner bodily injury claim. *Id.* at 40.

Stephens testified that she has no knowledge of the time-limit demand purportedly sent by the Czaia Law Firm on April 24, 2017. *Id.* at 41-42. She cannot

say whether or not the demand letter was ever sent; she testified that she never saw it. *Id.* at 42.

     5.   *Deposition of Steve Auberry (Doc. 20-19)*

In the 2016–2017 time frame, Steve Auberry was a manager in the casualty department for MET. Doc. 20-19 at 5. In 2016, the Tampa field office was closed and the employees were assigned to the St. Louis field claim office but they still worked remote from Florida. *Id.* at 6. With the closure of the Tampa office, mail was sent to a post office box in St. Louis and facsimiles were sent to a centralized St. Louis fax machine. *Id.* For all Florida casualty claims, the mail and faxes were reviewed by David Koetting, who resided in St. Louis. *Id.* at 7–8. For time sensitive material, such as proposals for settlement (PFS) or demand letters, he would log the material in the related claim file. *Id.* at 8. Koetting logged in the claim file the PFSs received from Plaintiff's counsel, but a demand letter was never logged as received. *Id.* at 9. Auberry could not say with any level of certainty as to whether the April 24, 2017, demand letter from Czaia Law Firm was ever received by MET. *Id.* at 10.

Once claim file notes are entered into the system by a MET adjuster, they are locked in place and cannot be altered. *Id.* at 15. At some point when Farmers Insurance bought MET, the software application used by MET for claims file documentation was discontinued and the information was transitioned into the system used by Farmers Insurance. *Id.* at 17-18. Auberry testified that Farmers Insurance acquired MET in April 2021. *Id.* at 4.

In Auberry's review of the claim file, he did not see where the affidavit of the Harrises was ever produced. *Id.* at 18. He did not see a copy of a letter to the Harrises advising them that Tiner's claim would exceed their policy limits. *Id.* at 20-21. The claim notes reflect Stephens sent a fax on March 10, 2017, but nothing in the file confirms that the Harris affidavit was what was faxed to the Czaia Law Firm. *Id.* at 26. There is no reference to the bodily injury claim in the claim file notes from March 10 until June 1, 2017. *Id.* at 26-27.

## II.    LEGAL STANDARD

### A.    Summary Judgment Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.*

at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

### B.    Applicable Law

In diversity actions such as this one, the Court is "*Erie*-bound to apply the substantive law of the forum state; here, Florida." *Ilias v. USAA Gen. Indem. Co.*, 61 F.4th 1338, 1344 (11th Cir. 2023) (citing *Mesa v. Clarendon Nat'l Ins. Co.*, 799 F.3d 1353, 1358 (11th Cir. 2015)).

## III.    DISCUSSION

MET moves for summary judgment arguing there is no disputed issue of material fact that it acted in good faith in handling Tiner's claim against its insureds, the Harrises. MET submits that it complied with its good faith duties under Florida law by diligently working to resolve Tiner's claims in the best interests of its insureds. MET contends it tendered its policy limits within eight days of the accident and continued to investigate and handle the claim in an effort to settle it. MET argues no

reasonable jury could conclude that its conduct was the proximate cause of the excess verdict against the Harrises.

Plaintiff responds that MET acted in bad faith in failing to act expeditiously to resolve the claim when it knew immediately that Tiner's claim far exceeded its insureds' $10,000 policy limits. Plaintiff argues MET acted in bad faith in failing to communicate the policy limits offer to Tiner directly and in failing to promptly provide an affidavit of its insureds confirming the lack of other insurance coverage.

Under Florida law, a bad faith claim has two elements: (1) bad faith conduct by the insurer, which (2) causes an excess judgment to be entered against the insured. *See Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 899 (Fla. 2010). The Court addresses each element in turn.

### A.    Bad Faith Conduct

In Florida, "[w]hen handling claims against its insured, an insurer 'has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business.'" *Macola v. Gov't Emps. Ins. Co.*, 953 So. 2d 451, 454–55 (Fla. 2006) (quoting *Boston Old Colony Ins. Co. v. Guiterrez*, 386 So. 2d 783, 785 (Fla. 1980)). The Florida Supreme Court has explained that:

> [W]hen the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured. This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise

> the insured of any steps he might take to avoid same. The
> insurer must investigate the facts, give fair consideration to
> a settlement offer that is not unreasonable under the facts,
> and settle, if possible, where a reasonably prudent person,
> faced with the prospect of paying the total recovery, would
> do so.

*Id.* at 455 (quoting *Boston Old Colony*, 386 So. 2d at 785).

Later, in *Harvey v. GEICO*, 259 So. 3d 1 (Fla. 2018), the Florida Supreme Court elaborated:

> The obligations set forth in *Boston Old Colony* are not a mere
> checklist. An insurer is not absolved of liability simply
> because it advises its insured of settlement opportunities, the
> probable outcome of the litigation, and the possibility of an
> excess judgment. Rather, the critical inquiry in a bad faith
> is whether the insurer diligently, and with the same haste
> and precision as if it were in the insured's shoes, worked on
> the insured's behalf to avoid an excess judgment.

*Id.* at 7.

The Florida Legislature codified the state's common law regarding third party bad faith claims, and statutorily allowed for first party claims by enacting section 624.155(1)(b)(1), Florida Statutes, which provides that "[a]ny person may bring a civil action against an insurer when such person is damaged" by the insurer "[n]ot attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for his or her interests." "Bad faith law was designed to protect insureds who have paid their premiums and who have fulfilled their contractual obligations by cooperating fully with the insurer in the resolution of claims." *Harvey*, 259 So. 3d at 6 (quoting *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 682 (Fla. 2004)). The effect of bad

faith law is to "hold[ ] insurers accountable for failing to fulfill their obligations . . . ." *Id.* (citing *Berges*, 896 So. 2d at 683).

"[T]he critical inquiry in a bad faith [case] is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Harvey*, 259 So. 3d at 7. This is determined based on evaluation of the totality of the circumstances. *Id.* (citing *Berges*, 896 So. 2d at 680). "Mere negligence alone is insufficient to constitute bad faith." Fla. Stat. § 624.155(5)(a). In this evaluation, however, negligence by an insurer is relevant to the question of good faith, but negligence is not the standard. *Harvey*, 259 So. 3d at 9. The focus is on the actions taken by the insurer in fulfilling its obligations to its insured, and not on the actions of the claimant.[3] *Id.* at 11 (citing *Berges*, 896 So. 2d at 677).

Here, MET argues it acted in haste—within 24 hours of receiving the assignment, Stephens made the decision to tender the bodily injury policy limits and issued a check to Tiner within eight days of the accident. However, the Eleventh Circuit has made clear that, "nothing in either *Boston Old Colony* or *Berges* can be read to suggest that an insurer's obligations end by tendering the policy limits. To the contrary, the insurer's duty to act in good faith 'in handling the defense of claims

---

[3] That said, "[i]n any action for bad faith against an insurer, the trier of fact may consider whether the insured, claimant, or representative of the insured or claimant did not act in good faith . . ., in which case the trier of fact may reasonably reduce the amount of damages awarded against the insurer." Fla. Stat. § 624.155(5)(b)(2). This provision of Florida's statutory bad faith law took effect on March 24, 2023. *See* FL LEGIS 2023-15, 2023 Fla. Sess. Law Serv. Ch. 2023-15 (C.S.C.S.H.B. 837).

against its insured' continues through the duration of the claims process." *Harvey*, 259 So. 3d at 10 (quoting *Boston Old Colony*, 386 So. 2d at 785). Thus, sticking a check in the mail, even when done promptly, is not enough to satisfy the insurer's duty to act in good faith and in the best interests of its insureds.

MET argues that it continued to act promptly and in the best interests of the insured. After issuing the check, Stephens continued to investigate, by hiring an investigator who obtained scene photographs and witness statements and attempted contact with Tiner and his family. Because Tiner was in the ICU, MET was prohibited from contacting him directly. The investigator was finally able to speak with Tiner on January 9, 2017, at which time Tiner advised he had hired an attorney who would be contacting MET.[4] During this time, Stephens informed the Harrises that she was trying to settle the claim for the policy limits and advised them that Tiner's claim would likely exceed their policy limits if not settled.[5] MET submits that Stephens was actively attempting to settle the Tiner claim in January, February and early March 2017, and anxiously awaiting contact from Tiner's attorney. But "anxiously waiting" may not have been enough. In cases "[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Ilias*, 61 F.4th at 1345 (quoting *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991)). As of December 28,

---

[4] Of note, either Tiner did not disclose the name of the attorney or the investigator never asked.

[5] Plaintiff disputes that the insureds were kept fully apprised that they could be potentially exposed to an excess verdict.

Stephens had identified the hospital's lien of $284,208.90. Thus, she knew within days of the accident that the injuries were significant and that the claim would exceed the insureds' policy limits. The Eleventh Circuit has held that where "[t]he financial exposure to [the insured] [i]s a ticking financial time bomb" and "[s]uit c[an] be filed at any time," any "delay in making an offer under the circumstances of this case even where there was no assurance that the claim could be settled could be viewed by a fact finder as evidence of bad faith." *Harvey*, 259 So. 3d at 7 (quoting *Goheagan v. Am. Vehicle Ins. Co.*, 107 So. 3d 433, 439 (Fla. 4th DCA 2012) (citing *Boston Old Colony*, 386 So.2d at 785)).

Although MET had already issued the policy limits check made payable to Tiner and the hospital, it knew in early January that Tiner was represented by counsel and therefore a new check would have to be issued. Simply waiting for months to hear from the attorney as opposed to taking a more proactive approach raises an issue of fact as to whether MET acted in the "same haste and precision as if it were in the insured's shoes." *Harvey*, 259 So. 3d at 7. Even if there was nothing more that MET could have done in January, February, and early March to find out the name of Tiner's attorney, MET certainly knew of the Czaia Law Firm as of March 9, 2017. And yet, the record reflects that Stephens made no contact with the Czaia Law Firm for the purpose of discussing Tiner's bodily injury claim for nearly four months from March 9 until June 28.

Although Plaintiff asserts that a letter of representation dated January 12, 2017, was sent to MET, Stephens testified she never received it and Plaintiff has not

presented documentary evidence supporting delivery or receipt of the January 12, 2017 letter on that date. However, Plaintiff has filed the declaration of legal assistant Rosana Colon whose responsibility it was in 2017 to send communications to insurers on behalf of the Czaia Law Firm. She states that to the best of her recollection she would have sent the letter in accordance with the firm's standard procedures for mailing and faxing communications. Of note, in early 2017, it is undisputed that the MET Tampa field office had been closed and Stephens was working remotely from her home. The letter was purportedly faxed to a facsimile number appearing in Stephens' signature block from the letter she sent Tiner with the policy limits check. It is undisputed that facsimile number was not the "main" MET fax number. At that time, all communications were routed to the home office in St. Louis, Missouri. Thus, whether the January 2017 letter from the Czaia Law Firm requesting insurance disclosure information, including the request for an affidavit from the insured as to whether any other insurance exists, was sent by Czaia and received by MET in January 2017 is in dispute.

Plaintiff insists the letter was sent; MET denies receiving it. "[M]atters of credibility are for a jury to settle at trial, not a trial court on summary judgment." *Ilias*, 61 F.4th at 1350 (citing *Anderson*, 477 U.S. at 255). In a light favorable to Plaintiff, the letter requesting insurance information was sent in January 2017 to a facsimile number that was no longer in use and/or not being monitored. Regardless, it is undisputed that the January 12, 2017, letter was received by MET on March 9, 2017, when it was re-faxed by Rosana on that date. In light of this, Plaintiff argues that as of at least March

9, 2017, MET was aware that the Czaia Law Firm was representing Tiner and that the firm was requesting an affidavit from MET's insureds confirming there was no additional insurance. Of significance to Plaintiff's arguments, MET was in possession of the affidavit from the Harrises as of February 6, 2017. Again, an issue of disputed fact arises because Stephens testified that she faxed the insureds' affidavit to the Czaia Law Firm on March 10, 2017; the Czaia Law Firm denies receiving it. Plaintiff represents that the first time he received the Harris affidavit was on October 20, 2017.

Stephens' claim file notes reflect a time of day that the fax was sent on March 10, 2017, but there is no letter or other documentary evidence in the claim file to confirm that what was faxed was in fact the Harris affidavit. The notes document that a two-page (including cover page) fax was sent. Whether or not the second page was the Harris affidavit cannot be determined from the documents.

The Czaia Law Firm purportedly sent a time-limit demand letter on April 24, 2017. Again, Stephens testified that she never received it. Rosana's declaration states that the letter would have been sent in accordance with the firm's procedures for faxing and sending mail. Whether the affidavit was sent is relevant to MET's duty of good faith to its insured. As early as January 3, 2017, MET's HOCA administrator Donovan was directing Stephens to obtain an affidavit from the insureds regarding the existence of any additional insurance coverage.  Plaintiff's claims handling expert Peter Knowe opined that it is an industry custom and practice to provide affidavits from the insureds showing they have no additional insurance; such disclosures are standard in cases settling for policy limits where the claim is in excess of those limits. "[T]he question of

whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard." *Berges,* 896 So. 2d at 680. And generally, the question of bad faith will be for "the jury to decide." *Harvey*, 259 So. 3d at 7 (quoting *Boston Old Colony*, 386 So. 2d at 785). Because genuine issues of material fact exist as to whether MET timely provided the insureds' affidavit to Tiner's counsel and whether it acted with the same haste and precision as if it were in the insured's shoes, Defendant's motion is due to be denied.

### B.    Causation

A threshold causal requirement in a bad faith action is that "[t]he damages claimed by an insured in a bad faith case 'must be caused by the insurer's bad faith.'" *Id.* (quoting *Perera*, 35 So. 3d at 902). To show that MET's alleged bad faith conduct "caused" the excess judgment against the Harrises, Plaintiff must establish that MET's conduct "directly and in natural and continuous sequence produce[d] or contribute[d] substantially to producing such [damage], so that it can reasonably be said that, but for the bad faith conduct, the [damage] would not have occurred." *Harvey*, 259 at 11 (quoting Fla. Std. Jury Instr. (Civ.) 404.6(a)).

Plaintiff has presented evidence through the affidavits of Rosana Colon and Ray Haas that Tiner authorized his attorneys to accept the ten-thousand-dollar policy limit if it could be confirmed that the Harrises did not have any other insurance. Doc. 25-6 ¶ 5; Doc. 25-7 ¶ 2. As discussed, above, there is a dispute of fact as to whether the affidavit signed by the Harrises, which was received by MET in early February, was ever provided to Plaintiff's counsel before suit was filed. This is factually similar to the

scenario in *Ilias v. USAA Gen. Indem. Co.*, 61 F.4th 1338, 1349 (11th Cir. 2023). In that case, the insurer did not timely provide information from the insureds under oath that no additional liability coverage existed, even after plaintiff's counsel expressed that the information was needed before she could advise plaintiff to accept the insurer's tender of policy limits. *Id.* 1349–50. In a light favorable to Plaintiff here, if Stephens had promptly provided to Plaintiff's counsel the Harris affidavit confirming no additional insurance and that Nancy Harris was not in the course of employment at the time of the accident, the case may have settled. A genuine issue of material fact exists as to whether MET caused the entry of an excess judgment against its insureds. Accordingly, it is

      **ORDERED**:

      1.    Because genuine disputes of material fact exist, Defendant's Motion for Summary Judgment (Doc. 20) is **DENIED**.

      2.    Within fourteen (14) days, the parties shall confer and file with the Court a joint notice of availability for trial, indicating the months from April 2026 through January 2027 that both sides are available for trial and the expected length (number of days) of trial. Upon receipt of the parties' notice, the Court will issue an amended Case Management and Scheduling Order setting the case for jury trial. Additionally, the Court will require the parties to attend a second mediation or a magistrate judge settlement conference before trial commences.

**DONE AND ORDERED** in Tampa, Florida on January 26, 2026.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record
Unrepresented Parties, if any